UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

KRISTEN DUMKE,                              )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )      No. 25 C 50328
                                            )
CHICAGO & VICINITY LABORERS'               )      Judge Rebecca R. Pallmeyer
DISTRICT COUNCIL PENSION FUND;             )
ELIZABETH FISCHER; ESTATE OF               )
JEFFREY DUMKE,                             )
                                            )
            Defendants.                     )

## MEMORANDUM OPINION AND ORDER

Jeffrey Dumke died in March 2024, survived by his widow, Elizabeth Fischer, and his ex-wife, Plaintiff Kristen Dumke. Kristen Dumke filed a lawsuit in state court seeking to enforce provisions of a divorce agreement granting her a share of her former husband's pension benefits. Defendants—the Pension Plan Administrator, Elizabeth Fischer, and the estate—removed the case to federal court on the basis that the determination by the Plan Administrator, Defendant Chicago & Vicinity Laborers' District Council Pension Fund[1] ("the Fund") to deny Kristen pension benefits is governed by the Employee Retirement Income Security Act ("ERISA"). The Fund agrees that Kristen and Jeffrey's divorce agreement is valid, but contends that Kristen is not entitled to the benefits because she failed to submit a domestic relations order ("DRO") to the Plan Administrator before Jeffrey's death. The Fund concluded that, in the absence of a pre-death DRO, full survivorship benefits vested with Jeffrey's widow, Elizabeth Fischer, on the day that Jeffrey died. Because, as the Fund reasoned, full benefits had already vested with Elizabeth, the DRO that Kristen Dumke submitted after Jeffrey's death was not a "qualified" domestic

---

[1] The Fund noted in its Notice of Removal [1] that its name in the caption is erroneously listed as the "Chicago & Vicinity Laborer's District Council Pension Fund." (Notice of Removal [1] at 1 n.1.) The Clerk is directed to resolve this error, naming the Fund instead as the "Chicago & Vicinity Laborers' District Council Pension Fund."

relations order ("QDRO"), a document required under ERISA for the distribution Kristen seeks. Kristen challenges that determination in this lawsuit. Both sides have moved for summary judgment. For the reasons explained here, the court grants Kristen's motion [35]: the Fund's refusal to qualify Kristen's DRO was mistaken, and Kristen is entitled to a portion of Jeffrey's pension benefits.

## BACKGROUND

### I.      Statutory Background

The Employee Retirement Income Security Act ("ERISA"), codified at 29 U.S.C. § 1056(d)(1), provides that "benefits provided under [a pension plan] may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). A decade after ERISA's conception, Congress passed the Retirement Equity Act ("REA") which amended ERISA to create limited and specific exceptions to the anti-alienation provision of ERISA for family law purposes. *See Ariz. Laborers, Teamsters, & Cement Masons, Loc. 395 Pension Tr. Fund v. Nevarez*, 661 F. Supp. 365, 367 (D. Ariz. 1987). The amended language distinguishes between domestic relations orders ("DRO") and qualified domestic relations orders ("QDRO"). 29 U.S.C. § 1056(d)(3). A DRO is "any judgment, decree, or order . . . relate[d] to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant . . . made pursuant to a State or Tribal domestic relations law." 29 U.S.C. § 1056(d)(3)(B)(ii). A QDRO is a DRO that "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan" and meets the requirements of subparagraphs (C) and (D) of ERISA Section 206(d)(3). 29 U.S.C. § 1056(d)(3)(B)(i). Only QDROs, not DROs, create an exception to the ERISA's anti-alienation provision. 29 U.S.C. § 1056(d)(3)(A).

Relevant to this litigation are the QDRO requirements outlined in Section (D) of ERISA Section 206(d)(3), which provide that a DRO will be deemed a QDRO only if it

2

> (i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan, (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and (iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

29 U.S.C. § 1056(d)(3)(D). ERISA further requires a plan administrator to "establish written procedures for determining whether a domestic relations order is a QDRO." *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 302 n.12 (2009) (quoting 29 U.S.C. § 1056(d)(3)(G)(ii)).

## II.     Factual Background

From 1999 through 2015, and 2020 through 2023, Jeffrey Dumke was employed and earned benefits in a defined benefit pension plan administered by Defendant Chicago & Vicinity Laborers' District Council Pension Fund ("the Fund"). (DSOF [32] ¶ 1.) Jeffrey and Kristen Dumke were married on September 13, 2005, in Bridgeview, Illinois, and divorced almost a decade later, on August 26, 2015. (*Id.* ¶ 2.) As part of the divorce, Jeffrey and Kristen entered into a marital settlement agreement, which was incorporated by the state family law court in its judgment for dissolution of marriage. (*Id.* ¶ 4.) Article VII of the settlement agreement set forth a division and allocation of each of Kristen and Jeffrey's property interests. It reads, in relevant part, as follows:

> Upon entry of Judgment, the following property shall be awarded to, retained by, paid to and/or turned over to Kristen as her sole and separate property, free and clear of any interest held or claimed by Jeffrey and Jeffrey waives any and all right, title and interest which he may have in and thereto: . . . 50% of the portion of Jeff's pension that was accrued during the course of the marriage with the Laborer's Pension Fund pursuant to a QDRO to be prepared and entered by Jeff within 60 days.

(PSOF [34] ¶ 5 (emphasis removed).) Further, Article II of the settlement agreement awarded child support to Kristen from Jeffrey for their child; Article III awarded maintenance support to Kristen from Jeffrey; and Articles IV, V, and VI "provided for division between Kristen and Jeffrey of certain of the minor child's expenses." (*Id.* ¶ 3.)

3

In 2016, some months after the divorce, Jeffrey contacted the Fund by phone to ask about the process for obtaining a QDRO, and the Fund responded by email, setting forth its QDRO procedures and guidelines for drafting a separate interest QDRO.[2] (DSOF [32] ¶ 7–8; Administrative Record ("AR") [26] at 42–46.) In July 2017, Kristen separately contacted the Fund via phone regarding a QDRO, and the representative on the phone directed her to the QDRO information available on the Fund's website. (DSOF [32] ¶ 9; AR [26] at 50.)

At some point after Kristen and Jeff's divorce (the record is unclear as to when), Jeffrey married Elizabeth Fischer. (DSOF [32] ¶ 3; PSOF [34] ¶ 8.) On March 15, 2024, Jeffrey passed away. (PSOF [34] ¶ 9.) Although both Jeffrey and Kristen had inquired about the Fund's QDRO procedures, neither had in fact submitted a QDRO during the nine years following their divorce. It was only after Jeffrey's death, on March 19, 2024, that Kristen again called Fund staff to ask how she should submit her QDRO documentation, and to inquire whether her son would be entitled to pension benefits.

On March 21, 2024, Kristen made another call to the Fund and spoke with a representative who asked whether Kristen had a QDRO that took the form of a court order signed and entered by a judge. (DSOF [32] ¶ 12.) Kristen said she did have such an order, explaining that Jeffrey and she "got a divorce in 2015 and months later she got a QDRO." (*Id.*; AR [26] at 80.) The representative advised Kristen to fax or email images of the QDRO, and Kristen did so March 31,

---

[2]     Under the "separate interest" approach to the distribution of retirement benefits,

> [t]he nonowning spouse's benefits are computed with respect to his or her life expectancy, and they do not depend in any way on the owning spouse's benefits. Each spouse can determine independently the date on which his or her benefits will start, making the usual choice between smaller benefits sooner and larger benefits later. If the husband elects early retirement, that fact has no effect on the wife's rights; the timing and amount of her benefits depend entirely on her election. Most importantly, because the spouses' benefits are independent, neither spouse's benefits stop upon the death of other. The nonowning spouse is treated for all intents and purposes as a full participant under the plan.

2 EQUITABLE DISTRIB. OF PROP. § 6:34 (4th ed. 2025).

2024.  (AR [26] at 80, 82–86.)  The form she attached was a draft court order entitled "Stipulated Qualified Domestic Relations Order"; Kristen explained that she had learned only in the previous week that "opposing council [sic] was supposed to enter the QDRO back in 2015 and never did." (*Id.* at 82; DSOF [32] ¶ 13.)  She further explained that she anticipated the state court judge would enter the order at an upcoming hearing on April 29, 2024.  (DSOF [32] ¶ 13.)

Indeed, on May 29, 2024, the state court entered an order entitled "Qualified Domestic Relations Order" *nunc pro tunc* to August 26, 2015—the date of Kristen and Jeffrey's divorce. (PSOF [34] ¶ 10; AR [26] at 5–9.)  The Fund contends that this order constitutes a DRO, but does not meet ERISA's requirements to be treated as a QDRO.  It is undisputed that Kristen's attorney sent the DRO to the Fund, though there is some confusion about the date of this event:  Kristen claims that her attorney sent the DRO to the Fund (evidently via email or postal mail) on June 5, 2024, but the Fund contends that although the cover letter prepared by Kristen's counsel bears the date "June 5, 2024," the Fund did not actually receive the DRO until July 8, 2024, according to other materials in the record.[3]  (PSOF [34] ¶ 13; Def.'s Resp. to PSOF [41] ¶ 13 (citing AR [26] at 90).)  The court notes that on July 10, 2024, Saundra Reed, the Fund's Pension Supervisor, confirmed receipt of the DRO from Kristen's counsel in its "recent correspondence dated June 5, 2024."  (AR [26] at 3.)  But in a July 18 letter to Kristen's attorney, Reed confusingly states that her letter is in response to "recent correspondence[] dated July 8, 2024."  (*Id.* at 60.)  No correspondence dated July 8, 2024 appears in the record; it seems likely that this was a typographical error by Reed, and that other references to July 8 in the record incorporate this error.

---

[3]  In its response to Plaintiff's Statement of Facts, the Fund states that "the Administrative Record reflects that the Fund received the domestic relations order on June 8, 2024," a date consistent with Kristen's assertion that it was sent on June 5, 2024.  (Def.'s Resp. to PSOF [41] ¶ 13.)  The portions of the AR that the Fund refers to instead state that the Fund received the court order on *July* 8, 2024 (AR [26] at 12, 60, 90)—perhaps a product of the typographical error discussed in text.

At some point between March and June of 2024, Jeffrey's surviving spouse, Elizabeth Fischer, applied for the qualified pre-retirement survivor annuity ("QPSA"), which pension plans must, by law, pay for life to a participant's spouse of at least one year when the participant dies before commencing his pension benefit. (DSOF [32] ¶ 14); *Boggs v. Boggs*, 520 U.S. 833, 843 (1997). In a July 10, 2024 letter from Saundra Reed to Peter Dowd, one of the Fund's attorneys, Reed stated that Elizabeth "is entitled to 100% Pre-Retirement Survivor Pension Benefits" and that "[b]enefits will be issued effective April 1, 2024 after approval by the Pension Committee at their meeting on July 9, 2024." (AR [26] at 2.) Also in that letter, however, Reed asked Attorney Dowd to review the DRO and "advise whether funds should be segregated for the Alternate Payee,"—i.e., Kristen. Evidently without waiting for a response from counsel, on July 9, 2024, the Pension Committee approved an award to Elizabeth of $2,036 per month, effective April 1, 2024.[4] Precisely when the Fund annuitized Elizabeth's benefit is not clear from the record. (PSOF [34] ¶ 19.)

On July 16, 2024, Dowd responded to Reed's question. Dowd advised that the DRO did not meet the requirements of a QDRO. He reasoned that "[i]f the Fund were to approve the order as a QDRO, it would necessarily divest the surviving spouse of her right to the 100% Pre-Retirement Survivor Pension" and "[a]n order that would divest a vested beneficiary of their right to survivor benefits does not meet the requirements for a QDRO," citing *Hopkins v. AT&T Glob. Info. Sols. Co.*, 105 F.3d 153, 156–57 (4th Cir. 1997) for support. (AR [26] at 11; DSOF [32] ¶ 19.) Reed notified Kristen's counsel of the Fund counsel's determination on July 18, 2024. (AR [26] at 60.)

---

[4] The Pension Committee meeting was set for July 9, 2024, so it is unclear why Reed's July 10 letter refers to that meeting as having not yet taken place. In any event, on its face, this letter suggests that that the Fund did not work to explore whether the DRO it received from Kristen's counsel qualified as a QDRO until after the Pension Committee had already approved full benefits for Elizabeth.

Through counsel, on February 7, 2025, Kristen objected to the Fund's July 18, 2024 refusal to deem the state court order a QDRO. (PSOF [34] ¶ 15; AR [26] at 63–64.) On February 28, Kristen's attorney filed a formal appeal with the Fund, incorporating the February 7 correspondence and advancing arguments she makes in this litigation, described below. (DSOF [32] ¶ 22.) The Fund denied the appeal in a letter dated March 14, 2025. (DSOF [32] ¶ 24, 25; PSOF [34] ¶ 18.) This lawsuit followed.

### III. Procedural Background

In a complaint filed in state court on June 5, 2025, Kristen named the Fund, Elizabeth, and the Estate of Jeffrey Dumke as Defendants, and asserted four claims: Counts I and II, against Jeffrey's Estate, allege breaches of the Marital Settlement Agreement. Count III, against the Fund, asks the court for an injunction reversing the Fund's determination that Kristen is not entitled to a portion of Jeffrey's pension fund. Count IV, against Elizabeth, asks for imposition of a constructive trust on pension benefits to which Kristen believes she is entitled. (Compl. [1-1] at 8–11.) On August 4, 2025, the Fund removed the case to federal court on the basis that federal law governs Count III as it "seeks an order directing an ERISA multiemployer employee benefit pension plan to pay certain pension benefits." (Notice of Removal [1] ¶ 18.) Elizabeth consented to removal on October 23, 2025.[5]

Elizabeth appeared and filed a responsive pleading, and Kristen and the Fund have filed motions for summary judgment. For the reasons explained below, the court grants Kristen's motion and denies the Fund's motion. With all federal claims resolved, the court relinquishes jurisdiction over Kristen's other state law claims.

---

[5] Counsel for the Fund, Jeremy Barr, represented Elizabeth solely for the purpose of filing her consent to removal. (Consent to Removal [19] at 1 n.1.)

**DISCUSSION**

I.     **Legal Standard**

To prevail on a motion for summary judgment, the moving party must show that "there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Elec. Constr. Indus. Prefunding Credit Reimbursement Program v. Veterans Elec., LLC*, 941 F.3d 311, 313 (7th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). A fact is material if it "might affect the outcome of the suit under the governing law." *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Where parties file cross-motions for summary judgment, the applicable standard does not change; courts "take the motions one at a time and then, as usual, construe all facts and draw all reasonable inferences in favor of the non-moving party." *Advance Cable Co. v. Cincinnati Ins. Co.*, 788 F.3d 743, 746 (7th Cir. 2015).

II.    **Analysis**

The Fund argues that the DRO Kristen has submitted is not a QDRO because it violates all three regulatory requirements for qualified status. First, the Fund argues that the DRO cannot be a QDRO because "the pension benefits at issue ceased to be 'payable with respect to a *participant* under a plan,' as required by ERISA Section 206(d)(B)(ii), on March 15, 2024, the date of Jeff[rey]'s death, when they vested with Elizabeth, a *beneficiary*, in the form of a QPSA benefit." (Fund's Mem. [31] at 9 (emphasis added).) Second, the Fund argues that the DRO cannot be a QDRO because "following its terms would require the Fund to pay increased benefits" by requiring the Fund to pay Elizabeth her full survivorship benefits plus an additional annuity to Kristen. (*Id.* at 11.) Finally, the Fund argues that the DRO violates 29 U.S.C. § 1056(d)(3)(D)(i) because it

8

would require the Fund to perform a new annuitization of Jeffrey's pension benefit based on Kristen's life after the Fund had already annuitized the benefit based on Elizabeth's life after Jeff died. This, the Fund contends, would require the Fund to provide a "type or form of benefit . . . not otherwise provided under the plan." (Fund's Mem. [31] at 12.) Kristen responds that the Fund's arguments are all based on the faulty premise that Elizabeth's survivorship interests necessarily include the portion of Jeffrey's pension fund in which Kristen already held an ownership interest, by virtue of the 2015 marriage settlement agreement.

The court agrees with Kristen: the Fund had notice that Kristen claimed an equitable ownership interest in a portion of Jeffrey's pension benefit via a court order as early as March of 2024, just a few days after Jeffrey's death, and failed to account for that interest before it began paying Elizabeth 100% of the pension benefits several months later. While the record is unclear as to when Fund annuitized benefits for Elizabeth, the Fund was on notice well before Elizabeth's payments were approved that Kristen had an interest in a portion of Jeffrey's benefit.

### A.    Kristen's Equitable Interest in a Portion of Jeffrey's Pension Benefits

Recall that Kristen and Jeffrey's marital settlement agreement contains a clause assigning to Kristen "50% of the portion of Jeff's pension that was accrued during the course of the marriage", "free and clear of any interest held or claimed by Jeffrey." (PSOF [34] ¶ 5.) The Fund takes no position on whether Kristen has a state-law property interest in a portion of Jeffrey's pension fund: In the Fund's view, "ownership of the pension benefits under state family law" is "immaterial," because the benefits are governed by federal law, "which prohibits the assignment of benefits to an ex-spouse" in the absence of a QDRO. (Fund's Resp. [42] at 5.) In other words, the Fund suggests that regardless of whether Kristen had a state-law right to a portion of Jeffrey's pension, any such right is unenforceable under federal law without the existence of a QDRO. It follows, the Fund contends, that in the absence of a valid QDRO, 100% of the survivorship interest in Jeffrey's pension plan vested in Elizabeth at the moment of Jeffrey's death, regardless of the terms of Jeffrey and Kristen's settlement agreement.

9

In support of its decision on Kristen's internal appeal, and in support of its motion for summary judgment in this litigation, the Fund relies on *Hopkins v. AT&T Glob. Info. Sols. Co.*, 105 F.3d 153, 154 (4th Cir. 1997). In *Hopkins*, the Fourth Circuit affirmed summary judgment in favor of defendant, the employer of plaintiff's ex-husband, which had determined that plaintiff's DRO was not a QDRO because the surviving spouse benefits over which plaintiff asserted a claim had already vested with Mr. Hopkins's current spouse upon his retirement. That case differs from this one, however; the ex-wife in the *Hopkins* case had not been "awarded a portion of the pension in the equitable distribution of the marital assets." *Id.* at 154. Instead, "Mr. Hopkins was ordered to pay [plaintiff] alimony," an order that plaintiff had enforced by way of a judgment attaching to Mr. Hopkins's wages. After he retired and the wages (and attachments) ceased, plaintiff sought to collect alimony from her ex-husband's pension benefits. The order she submitted directed that she "be made the alternate payee of Mr. Hopkins's Pension Benefits," and also that she, and not Mr. Hopkins's current spouse, be made the payee of the Survivor Spouse Benefits. *Id.* at 155. Notably, the defendant in *Hopkins* "concede[d] that the Pension Order is a QDRO," and instead argued only that the portion of the order pertaining to the Surviving Spouse Benefits was not a QDRO, as those had already vested in Mr. Hopkins's current wife. Ultimately the Fourth Circuit agreed with the defendant's position.

Unlike the plaintiff in *Hopkins*, Kristen Dumke seeks to enforce her rights to a fixed portion of Jeffrey's pension benefits—50% of the pension benefits Jeffrey earned during the course of their marriage—that were established by contract years prior to Jeffrey's death. She does not seek to establish ownership rights via a newly ordered QDRO; she seeks only to enforce rights she had already won in a court determination. Further, unlike the plaintiff in *Hopkins*, Kristen does not seek to fully replace Elizabeth as Jeffrey's surviving spouse. *Cf. id.* at 155 ("The Circuit Court of Wood County ordered that Vera Hopkins, and not Sherry Hopkins, be made the payee of the Surviving Spouse Benefits.") Instead, she seeks only to receive the portion of benefits she claims she is entitled to under the terms of her marital settlement agreement. Kristen's DRO therefore

10

looks more like the uncontested Pension Order in *Hopkins*—whereby the plaintiff was able to collect past due alimony (a pot of money in which she had a clear ownership interest) directly from her ex-husband's pension—than it does the Surviving Spouse Benefits order central to the Fourth Circuit's reasoning.

Further, *Hopkins* was addressing a qualified joint and survivor annuity ("QJSA"), a type of benefit available only where a plan participant has already retired, and one that vests with the participant's spouse upon their retirement. *Carmona v. Carmona*, 603 F.3d 1041, 1053 (9th Cir. 2010). The interest at issue here is a qualified preretirement survivor annuity ("QPSA"), because Jeffrey died before he began collecting annuities under his pension plan. The Ninth Circuit in *Carmona*, 603 F.3d at 1043, and *Trs. of the Dirs. Guild of America-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 420 (9th Cir. 2000), found that the reasoning in *Hopkins* was applicable only to QJSAs, and rejected its applicability as to QPSAs. The court considered the *Hopkins* court's thorough analysis of 29 U.S.C. § 1055 and its detailed statutory scheme for opting out of QJSA benefits. QJSA benefits must be affirmatively opted out of in writing by a participant and their spouse, and Congress provided that such opt-outs may only be completed in the applicable election period which is defined as "the 180-day period ending on the annuity starting date." 29 U.S.C. § 1055(c)(2), (7). As explained in *Carmona*, the Ninth Circuit read that language as confirming that QJSA benefits necessarily vest on the date of a plan participant's retirement. 603 F.3d at 1057. But the situation is different for QPSA benefits. in the case where a participant dies before annuities begin, *Tise* concluded that "so long as a valid DRO creates an alternate payee's legally enforceable property interest in QPSA benefits, a QDRO can be obtained even after the plan participant's death." *Carmona*, 603 F.3d at 1056 (citing *Tise,* 234 F.3d at 423). These distinctions are significant here.

The Fund brushes aside Kristen's state-court order, urging that "the Fund's administration of Jeff's pension benefit is governed by ERISA, not Illinois family law," and without a valid QDRO, Kristen had no valid property interest in Jeffrey's pension. (Fund's Resp. [42] at 5.) But this

11

argument has been rejected by numerous courts that have considered it. For example, in *In re Brown*, 168 B.R. 331 (Bankr. N.D. Ill. 1994), the bankruptcy court for the Northern District of Illinois considered a case where an ex-wife sought to exclude, from her ex-husband's bankruptcy estate, the portion of his pension benefits that were awarded to her upon their divorce. The court agreed with her, rejecting the debtor's argument that his ex-wife's property interest in a portion of his pension fund "was never 'perfected' because of her failure to file a QDRO which complied with [the plan's] standards." *Id.* at 335 n.6. To the contrary, the court held that "upon entry of the divorce judgment, the benefits became the sole and separate property of the Plaintiff," and the "QDRO merely served to enforce her preexisting property rights in the pension." *Id.* at 335. While, due to the lack of a valid QDRO, the ex-wife "had no recognizable *legal right* under ERISA," she "did have an *equitable interest* in the Debtor's pensions arising from the entry of the decree of dissolution." *Id.* at 335 n.6.[6]

Similarly, in *Miletello v. R M R Mech., Inc.,* 921 F.3d 493, 497 (5th Cir. 2019), the Fifth Circuit affirmed a grant of summary judgment for an ex-wife who obtained an amended QDRO incorporating the terms of her divorce settlement after her ex-husband died. *Miletello* is not on all fours with this case—it involved the ex-wife's claim to a portion of her husband's 401(k) plan, not to pension benefits—but *Miletello* did address the QDRO provisions of ERISA that are relevant here. The court concluded that the ex-wife had a valid interest in a portion of her ex-husband's 401(k), even if her QDRO was obtained after her ex-husband's death because "[t]he QDRO provisions of ERISA do not suggest that [the former spouse] has no interest in the plans until she obtains a QDRO, they merely prevent her from enforcing her interest until the QDRO is obtained."

---

[6] The Fund argues that *In re Brown* actually supports its position because the court there acknowledged that "for an ex-spouse to have an enforceable interest against a spouse's ERISA-qualified plan administrator there must be a [QDRO] in place." (Fund's Reply [43] at 3 (quoting *In re Brown*, 168 B.R. at 335.) But the Fund's argument takes the court's reasoning out of context. As this court reads *In re Brown*, it confirms that an ex-spouse must have a QDRO in order to enforce her interest—but the interest itself can arise from the divorce decree, as Kristen's did here.

*Miletello*, 921 F.3d at 497 (alterations in original) (quoting *Yale-New Haven Hosp. v. Nicholls*, 788 F.3d 79, 86 (2d Cir. 2015)).  That rationale means that, in assuming that 100% of survivorship benefits vested with Elizabeth upon Jeffrey's death, the Fund failed to account for Kristen's valid state-law property interest.  Because Kristen held an equitable interest in a portion of Jeffrey's pension benefits, the full pension benefit did not vest with Elizabeth upon Jeffrey's death and, as explained below, should not have been distributed to her while the Fund was on notice of Kristen's effort to obtain the QDRO.

### B.      Timing Issues

Relevant statutory provisions support Kristen's position here.  In the Pension Protection Act of 2006 ("PPA"), Congress made clear that a QDRO will not fail solely because of the time at which it is issued.  Pub. L. No. 109–280, § 1001, 120 Stat. 780 (2006).  This means that "[d]omestic relations orders entered after the death of the plan participant can be QDROs." *Nicholls*, 788 F.3d at 85.  In regulations promulgated in response to the PPA, the Department of Labor offers some illustrative examples.  One of these, entitled "orders issued after death," reads as follows:

> Participant and Spouse divorce, and the administrator of Participant's plan receives a domestic relations order, but the administrator finds the order deficient and determines that it is not a QDRO.  Shortly thereafter, Participant dies while actively employed.  A second domestic relations order correcting the defects in the first order is subsequently submitted to the plan.  The second order does not fail to be treated as a QDRO solely because it is issued after the death of the Participant. The result would be the same even if no order had been issued before the Participant's death, in other words, the order issued after death were the only order.

29 C.F.R. § 2530.206(c).

In response to Kristen's argument based on the PPA, the Fund insists that its decision to award full benefits to Elizabeth Fischer was not based on timing alone, but was based instead on factors that, while related to timing, are separate and distinct: that Elizabeth's interest had already vested at the time Kristen provided the fund with her QDRO, and that the QDROs would require the Fund to reannuitize the pension benefits based on Kristen's life expectancy.  As explained

13

earlier, however, these arguments are based on the assumption that 100% of pension plan benefits vested in Elizabeth upon Jeffrey's death—an assumption this court does not share. Moreover, as noted earlier, it is not clear when exactly the Fund annuitized the pension benefit based on Elizabeth's life expectancy. What *is* clear is that Kristen put the Fund on notice of her entitlement to a portion of Jeffrey's pension as early as March 19, 2024, just four days after Jeffrey passed away and well before the Fund's Pension Committee approved benefits for Elizabeth on July 9, 2024. Further, both Jeffrey and Kristen reached out to the Fund following their divorce, and long before his death, to inquire about the Fund's QDRO procedures. That the Fund would need to reannuitize benefits based on Kristen's life after annuitizing them based on Elizabeth's alone is a function of the Fund's failure to account for Kristen's DRO and possible QDRO despite being on notice of it. The court is unwilling to approve a result that penalizes Kristen for the Fund's apparent mistake.

*Yale-New Haven Hosp.l v. Nicholls*, 788 F.3d 79, 86 (2d Cir. 2015), a case not addressed by either party, provides direct guidance. In that case, the Second Circuit considered an interpleader action brought by a plan provider to resolve competing claims brought by a plan participant's ex-wife and his widow. The court affirmed the district court's determination that the ex-wife's *nunc pro tunc* orders entered after the plan participant's death were QDROs, rejecting the widow's argument "the two *nunc pro tunc* orders do not constitute valid QDROs because they were entered after the death" of the husband: "Congress has made clear that domestic relations orders are not invalid simply because they were entered after the death of the plan participant." *Nicholls*, 788 F.3d at 84. Further, the court reasoned that "where a plan administrator must determine whether a domestic relations order is a QDRO, any interest in plan benefits does not vest automatically with a surviving spouse." *Id.* at 87. Instead, citing statutory language, the court observed that "ERISA provides for certain procedures that require a plan administrator to protect an alternate payee's potential interest in plan funds":

14

> During any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise), the plan administrator shall separately account for the amounts . . . which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order.

*Id.* (quoting 29 U.S.C. § 1056(d)(3)(H)(i)). "If the order is determined to be a QDRO within eighteen months of the date on which 'the first payment would be required to be made under the domestic relations order,' the plan administrator must pay the required amounts to the alternate payee." *Id.* (quoting 29 U.S.C. § 1056(d)(3)(H)(ii)-(v)). [7]

Neither party in this case has commented on *Nicholls* or on this provision of ERISA and its effect on the Fund's obligations. But as the court reads the statute, the Fund was *legally obligated* to segregate the portion of the pension benefits Kristen was possibly entitled to while Kristen perfected her property interest via a QDRO.[8] Indeed, the Ninth Circuit in *Tise*, 234 F.3d at 415 (another case the parties do not discuss), considered this section of ERISA in some detail. *Id.* at 422–23. There, the plan participant's widow and named beneficiary argued that she was "entitled to the entire fund because, as [the decedent's] designated beneficiary, she automatically became vested in the death benefit upon his death," rendering the ex-wife's QDRO, which the ex-wife obtained following her ex-husband's death, "unenforceable." *Id.* at 419. The Ninth Circuit

---

[7] The majority opinion in *Nicholls* drew a thoughtful dissent. The dissenting judge disagreed that the *nunc pro tunc* orders constituted valid QDROs based on his concern that such orders disrupt the "efficient, predictable, and uniform national standards" Congress sought to set out in its "comprehensive federal regulatory scheme" outlined by ERISA. *Nicholls*, 788 F.3d at 92 (Wesley, J., dissenting in part). The dissent took particular note of the fact that the plan there had received "no pre-death notice of the competing interest." *Id.* at 96. But here, the Fund *did* have some pre-death notice of Kristen's interest by virtue of the fact that both Jeffrey and Kristen reached out to the Fund in 2016 to inquire about the Fund's QDRO process shortly after their divorce. This is not a case where Kristen's claims came to the Fund out of nowhere, as in *Nicholls.*

[8] The Fund criticizes Kristen for her "inability to cite any authority that actually supports her position that the Fund was obligated to segregate portion of Jeff's benefits for her without a QDRO." (Fund's Reply [43] at 3.) The court similarly questions why Kristen has not invoked ERISA's requirements on this issue; but the court is also troubled by the Fund's apparent lack of awareness of ERISA provisions that appear specifically to require segregation of disputed funds until the qualified status of Kristen's DRO was fully determined.

rejected this argument, finding, in ERISA's "language and structure" "no conceptual reason why a QDRO must be obtained before the plan participant's benefits become payable on account of his retirement or death." *Id.* at 421.

The *Tise* court pointed to four features of ERISA that mandated this result: (1) "for all the detail of the QDRO requirements, ERISA nowhere specifies that a QDRO must be in hand before benefits become payable;" (2) "the statute specifically provides for situations in which no valid QDRO issues until after benefits become payable," specifically in 29 U.S.C. § 1056(d)(3)(G)(II), which allows the plan to "take a reasonable period to determine whether [an] order is a QDRO and therefore creates obligations for the pension plan" once this plan is "on notice" of a DRO, and 29 U.S.C. § 1056(d)(3)(H), which requires the plan to "segregate the benefits that would be due to the alternate payee under the terms of the DRO during the first 18 months that those benefits would be payable if the DRO is ultimately deemed a QDRO;" (3) Congress "expressly contemplated that further state court proceedings might ensue during the 18–month QDRO-determination period" because there is "no reason it should take any plan administrator 18 months to puzzle over the domestic relations order initially presented to the plan in order to determine whether it is a QDRO"; therefore, the "evident purpose" of the 18-month period "was to provide a time in which any defect in the original DRO could be cured;" and finally, (4) the statute "specifies with particularity the circumstances in which the putative alternate payee loses the right to hold up the payment of benefits to the participant or his designated beneficiary," namely if the "DRO's status is still in doubt" after the 18-month period. *Id.* at 421–422.[9]

After meticulously outlining the statutory language and structure of ERISA, the Ninth Circuit summarized:

---

[9]     The *Tise* court recognized that it was not addressing a case like *Hopkins* involving statutorily-created surviving spouse annuities under 29 U.S.C. § 1055 where an alternate payee seeks to "obtain an enforceable QDRO substituting the alternate payee for the surviving spouse with regard to statutory surviving spouse benefits," *Tise*, at 661 n.6.  As explained above, this is not such a case.  Kristen is not arguing that she is entitled to all of the rights of the surviving spouse, Elizabeth.

> This complex, carefully articulated statutory scheme, then, plainly contemplates, and accounts in detail for, the situation in which the event that triggers the payment of benefits occurs *before* the plan knows whether it will be obliged to make payments to an alternate payee. As such, the statute necessarily permits an alternate payee who has obtained a state law DRO before the plan participant's retirement, death, or other benefit-triggering event to perfect the DRO into a QDRO thereafter (subject to the 18–month period after which any previously-due benefits are payable to the original beneficiary). . . . If an alternate payee's right to ERISA plan proceeds were automatically cut off once an event occurred that, absent an enforceable QDRO, would make the proceeds payable to someone else, then a plan participant's retirement, the vicissitudes of court scheduling, or a plan participant's death, all events beyond the control of the alternate payee, could determine the parties' substantive rights.

*Id.* at 423 (footnote omitted). That reasoning is persuasive here. Kristen seeks payments to which the state law order entitle her; events beyond her control should not make her ineligible to receive this benefit.

Based on the authorities cited here and the language of ERISA itself, the court grants summary judgment on Count III in favor of Kristen. Counts I and II, brought against Elizabeth and Jeffrey's estate, are dismissed without prejudice to renewal, if appropriate, in state court. *See Doe v. Lindell*, No. 22-1666, 2023 WL 196467, at *4 (7th Cir. Jan. 17, 2023) ("[A] federal ruling here would inappropriately insert the federal courts into an ongoing state family-court proceeding—an area of law traditionally reserved for the states.")

17

## **CONCLUSION**

Kristen Dumke's motion for summary judgment [35] is granted. The Fund's motion for summary judgment [30] is denied. The Fund is ordered to qualify Kristen's DRO and remit to her the benefits to which she is entitled. The remaining state-law claims are dismissed without prejudice to renewal in state court. Because the court makes its ruling in part based on arguments not raised by the parties, the court will delay entry of judgment for 14 days; the parties are invited to identify errors in the court's reasoning within 14 days. *See* FED. R. CIV. P. 56(f) (empowering a district court to grant summary judgment "on grounds not raised by a party" after "giving notice and a reasonable time to respond").

ENTER:

Dated: July 13, 2026

REBECCA R. PALLMEYER
United States District Judge