**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **KRISTEN DUMKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 25 C 50328** |
| | ) | |
| **CHICAGO & VICINITY LABORERS' DISTRICT COUNCIL PENSION FUND; ELIZABETH FISCHER; ESTATE OF JEFFREY DUMKE,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Kristen Dumke filed this lawsuit to enforce provisions of a divorce agreement that granted her a share of her former husband's pension benefits. (Compl. [1-1].) She challenged a determination by Defendant Chicago & Vicinity Laborers' District Council Pension Fund ("the Fund") that she is not entitled to those benefits because she failed to submit a domestic relations order ("DRO") to the Fund before the death of her ex-husband Jeffrey Dumke. (*Id.* ¶¶ 15, 18.) The Fund concluded that, in the absence of a pre-death DRO, full survivorship benefits vested with Jeffrey's widow, Elizabeth Fischer, on the day that Jeffrey died. (*Id.*) Because full benefits had already vested with Elizabeth, the Fund reasoned, the DRO that Kristen Dumke submitted after Jeffrey's death was not a "qualified" domestic relations order ("QDRO"), a document required under ERISA for the distribution Kristen seeks. (*Id.* ¶ 18.) Both sides moved for summary judgment, and in a July 13, 2026 opinion [50], the court granted Kristen's motion for summary judgment and denied the Fund's. The court assumes the parties' familiarity with that ruling. Because the court made its ruling in part based on arguments not raised by the parties, the court permitted the parties to "identify errors in the court's reasoning." (Order [50] at 18.) The Fund has filed a response to the court's summary judgment ruling, arguing that the court's reasoning

was flawed, and requesting that the court reconsider its ruling. (Resp. to Summary Judgment Order [53].) For the reasons explained here, the request is denied.

In its response, the Fund challenges the court's order on three grounds. First, the Fund contends that the court has drawn a "distinction between Qualified Joint and Survivor Annuities ("QJSA") and Qualified Pre-Retirement Survivor Annuities ("QPSA") that is contrary to existing law to argue that Elizabeth did not vest in the QPSA benefit as of Jeffrey's death." (Resp. to Summary Judgment Order [53] at 5.) Second, the Fund argues that the order "confuses the regulatory framework around the processing of QDROs and the statutory provisions around vesting to create a 'notice' standard that is unsupported by applicable case law and is unworkable for plan administration." (*Id.* at 8.) And finally, the Fund argues that a Second Circuit case that the court relied on, *Yale-New Haven Hosp. v. Nicholls*, 788 F.3d 79 (2d Cir. 2015), was "incorrectly decided." (*Id.* at 12.) The court finds these arguments unconvincing.

First, with respect to the distinction between QPSA and QJSA benefits, the court stands by its reasoning. QPSA benefits are paid to a surviving spouse of at least one year when a plan participant dies before commencing his pension benefit. QJSA benefits are survivorship benefits paid to a surviving spouse upon the death of a plan participant who dies after retirement. Elizabeth's interest is a QPSA because Jeffrey died before he began collecting annuities under his pension plan. Relying primarily on *Hopkins v. AT&T Global Information Solutions Co.*, 105 F.3d 153, 156 (4th Cir. 1997), the Fund argues that full QPSA benefits vested with Elizabeth at the point of Jeffrey's death: The Rund reasons that because QJSA benefits vest at retirement, QPSA benefits must similarly vest at death. (Resp. to Summary Judgment Order [53] at 5–7.) But courts considering the vesting rules for QPSA benefits have found them distinguishable from the vesting rules for QJSAs outlined in *Hopkins. See Nicholls*, 788 F.3d at 88 (considering QPSA benefits and holding that a surviving spouse "did not gain an automatic and irrevocable interest in [her ex-husband's] plan benefits on the date of his death" because "a surviving spouse . . . does not gain an irrevocable right to plan benefits until *after* the plan administrator has determined that

a domestic relations order is not qualified" (emphasis added)); *see also Carmona v. Carmona*, 603 F.3d 1041, 1056 (9th Cir. 2010) ("[W]e have held that so long as a valid DRO creates an alternate payee's legally enforceable property interest in QPSA benefits, a QDRO can be obtained even after the plan participant's death.").

As the Fund sees things, *Carmona* was mistaken in its reasoning because the case *Carmona* cited, *Trs. of the Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise*, 234 F.3d 415, 420 n.3 (9th Cir. 2000) did not, in fact, involve QPSA benefits--the plan participant and the mother of his children in *Tise* were never married, so, as the Fund reads that case, QPSA benefits were not implicated. True, *Tise* did not consider QPSA benefits directly, but *Carmona* distinguished benefits hinging on a plan participant's death from those hinging on a plan participant's retirement, making reference to *Tise*, which also involved the pre-retirement death of a plan participant. (Resp. to Summary Judgment Order [53] at 4.); *Carmona*, 603 F.3d at 1060; *see also Tise*, 234 F.3d at 418. Despite this claimed misunderstanding, the Ninth Circuit's reasoning in *Carmona* is more directly relevant than the Fourth Circuit's rationale in *Hopkins*: extrapolating treatment of benefits upon death of a plan participant to QPSA benefits is more logical than applying the rigid rules outlined in the vesting-at-retirement cases because death is ordinarily a less predictable event than retirement. *See Carmona*, 603 F.3d at 1058. Indeed, *Hopkins* based its reasoning in part on the understanding that retirement was predictable: "A former spouse's interest in the Surviving Spouse Benefits can be protected simply by obtaining a QDRO before the participant retires." *Hopkins*, 105 F.3d at 157. The same reasoning cannot (and should not) apply to benefits that implicate a plan participant's death, which can happen at any, unpredictable moment. The court finds the Ninth and Second Circuits' reasoning persuasive: Elizabeth's QPSA interest did not vest at Jeffrey's death.[1]

[1] The Fund cites *Davenport v. Davenport*, 146 F. Supp. 2d 770, 780 (M.D.N.C. 2001), a district court case applying *Hopkins* to QPSA benefits and determining that such benefits vest upon a plan participant's death. (Def. Mem. in Response to SJ Ruling [53] at 2.) In light of contrary circuit court authority, the court declines to follow *Davenport*.

Second, the Fund argues that it did not err when, despite having notice of Kristen's interest in a portion of Jeffrey's pension benefits, the Fund failed to segregate benefits as required by 29 U.S.C. § 1056(d)(3)(H). (Resp. to Summary Judgment Order [53] at 8.) The Fund urges that ERISA's segregation requirement is triggered only upon receipt of an entered order. (*Id.* at 11.) But the Fund points to no court interpreting this provision of ERISA and limiting its application to circumstances where a plan administrator is already in receipt of an entered state court order. Indeed, the Ninth Circuit in *Tise* found that "Congress expressly contemplated that further state court proceedings might ensue during the 18-month QDRO-determination period, through which the alternate payee could attempt to cure any defects in the original DRO and obtain an enforceable QDRO." *Tise*, 234 F.3d at 422. And "[only] after the requisite 18 months have passed . . . is it possible for a designated beneficiary to have a right to any part of a participant's pension plan proceeds that cannot be displaced by a QDRO." *Id.* This 18-month opportunity to perfect the DRO after the benefit-triggering event implicitly accounts for situations like Kristen's and implies that notice to the Fund of an order, even if not perfected, is sufficient to trigger the segregation requirement imposed by § 1056(d)(3)(H). Moreover, the statute recognizes circumstances in which the alternate payee loses the right to hold up the payment of benefits to the designated beneficiary, namely if the "DRO's status is still in doubt" after the 18-month period. *Tise*, 234 F.3d at 422. Lack of receipt of the QDRO before vesting is not an enumerated circumstance.

The Fund further argues that "[n]o case has held that notice of a DRO received by a pension plan after a surviving spouse has vested in a QPSA or QJSA is sufficient to divest the surviving spouse of that benefit." (Resp. to Summary Judgment Order [53] at 9.) But in so arguing, the Fund disregards the court's finding that, under ERISA's statutory scheme, Elizabeth's QPSA interest could not vest *until* the plan determined the qualified status of Kristen's DRO. This finding is, as described above, supported by *Nicholls*, *Carmona*, and common sense. The Fund calls the court's interpretation of ERISA's statutory requirements "unworkable for plan

administration." (*Id.* at 8.) But this argument finds no support in the statute. In adopting § 1056(d)(3)(H)'s segregation requirements, Congress balanced interests in ease of plan administration with its interest in "mitigat[ing] the impact of divorce upon children and former spouses." *Tise*, 234 F.3d at 425. ERISA's complex statutory scheme reflects this careful balancing. *Id.* Moreover, as this court noted in its earlier ruling, this case does not implicate the circumstances in the *Nicholls* dissent, because the plan *did* have pre-death notice of the Dumke divorce. (Summary Judgment Order [50] at 15 n.7.) The purported unworkability of plan administration in the face of such notice is attributable to the Fund's own record-keeping systems, not to he court's application of ERISA's requirements.

Finally, the Fund finds that the dissenting opinion in *Nicholls* more persuasive than the holding. (Resp. to Summary Judgment Order [53] at 13.) Many of the arguments raised by the Fund on this point have been addressed in the court's reasoning above. One is worth further discussion: the Fund argues that the *nunc pro tunc* orders in *Nicholls* and in this case necessarily would require reannuitization of plan participant benefits, here based on Kristen's life. (*Id.* at 14.) Because reannuitization is a "benefit . . . not otherwise provided under the plan," the Fund contends, this alone is sufficient to disqualify Kristen's DRO from becoming a QDRO. (Fund's Mem. [31] at 12; *see also* Resp. to Summary Judgment Order [53] at 15.) The Fund reasons that the court's assessment of reannuitization in its summary judgment order "treat[ed] reannuitization as a matter of fact rather than law." (Resp. to Summary Judgment Order [53] at 14 n.3.) The Fund cites Department of Labor ("DOL") regulations promulgated in response to the Pension Protection Act of 2006, which state that "an order requiring a reannuitization with a new annuity starting date would include an order issued after the annuity starting date directing the plan to substitute one measuring life for another." 75 Fed. Reg. 32848. The Fund's position assumes that an annuity start date for QPSA benefits must be tied to the date of a plan participant's death. (Resp. to Summary Judgment Order [53] at 14 ("While this language references the 'annuity starting date,' the analogous vesting event for QPSAs is the participant's death.").) The court

does not share that assumption. The statute provides that "the earliest period for which the surviving spouse may receive a payment under such annuity is not later than the month in which the participant would have attained the earliest retirement age under the plan." 29 U.S.C. § 1055(e)(1)(B). In other words, the annuity start date can be set at any point before a deceased participant would have reached early retirement age. Jeffrey died at age 52 (DSOF [32] ¶ 10), and while neither party has commented on the Fund's early retirement age, the Fund has not suggested that Jeffrey was eligible for early retirement near the time of his death. For reasons it has not explained, the Fund set the annuity start date for Elizabeth's benefit at April 1, 2024, despite being on notice, just days earlier, that Kristen was actively seeking to resolve the deficiencies in her DRO, and despite its ability to set a later annuity start date. (*Id.* ¶¶ 13, 20.) The same reasoning undermines the Fund's invocation of DOL regulations regarding DROs received after an annuity start date seeking to reallocate survivor benefits.

The court's reasoning in its summary judgment order stands:

> That the Fund would need to reannuitize benefits based on Kristen's life after annuitizing them based on Elizabeth's alone is a function of the Fund's failure to account for Kristen's DRO and possible QDRO despite being on notice of it. The court is unwilling to approve a result that penalizes Kristen for the Fund's apparent mistake.

(Summary Judgment Order [50] at 14.)

## CONCLUSION

The Fund's request for reconsideration of the court's summary judgment order [53] is denied. The Fund is ordered to qualify Kristen's DRO and, within 30 days, remit to her the benefits to which she is entitled.

ENTER:

REBECCA R. PALLMEYER
United States District Judge

Dated: October 20, 2026